CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

OCT 2 6 2007

JOHN F. CORCORAN, CLERK
BY: /s/
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff, | )<br>)<br>) |
| v. | )    Case No. 7:07-mj-507<br>) |
| SEAN MOORE,<br>    Defendant. | )   By:  Hon. Michael F. Urbanski<br>)         United States Magistrate Judge |

## MEMORANDUM OPINION

Defendant Sean Moore ("Moore"), charged with possession of a controlled substance on the Blue Ridge Parkway ("Parkway") in violation of 36 C.F.R. § 2.35(b)(1), moved to suppress certain evidence obtained from a search of his person. After hearing the evidence and reviewing briefs on the subject, the court grants Moore's Motion to Suppress as the search of Moore's person violates the Fourth Amendment to the United States Constitution.

### I.

On July 25, 2007, Ranger Gagnon of the National Park Service ("NPS") was working on special assignment as part of a Criminal Interdiction Task Force assigned to the Parkway in connection with FloydFest,[1] an annual music festival held near the Parkway in Floyd County, Virginia. Ranger Gagnon observed Moore's pickup truck driving on the Parkway in patchy, thick fog with only parking lights on, causing Ranger Gagnon to activate his emergency lights and pull Moore's truck over. Ranger Gagnon testified that as he approached the truck, Moore voluntarily placed both of his hands out of the driver's side window, which Ranger Gagnon

---

[1] "FloydFest is a four-day Music Festival held annually in the Blue Ridge mountains of Virginia, showcasing the best in World, Bluegrass, Reggae, Folk, African and Appalachian music, as well as quality local Arts and Crafts." http://www.floydfest.com/2007/dir.php?dir_id=8&page=8.

interpreted to mean that Moore was signaling that he had a weapon in the car. When apprised of the reason for the stop, Moore stated that he thought he had his lights on. Ranger Gagnon also testified that Moore was "extremely polite," "way too nice," rambling, cooperative and forthcoming while answering questions, which Ranger Gagnon testified raised his level of suspicion. Ranger Gagnon requested Moore's driver's license and ordered him to exit and step to the rear of Moore's truck. Ranger Gagnon testified that based on Moore's behavior, he determined the need to detain him for further investigation. Ranger Gagnon then asked Moore for consent to search the vehicle, which Moore willingly gave, stating "by all means, go ahead brother."

Ranger Gagnon testified at trial that he searched the passenger compartment of the pickup and found no weapons, illegal narcotics, alcohol or other contraband. The Ranger then proceeded to search luggage located in the bed of the pickup belonging to a passenger. In such luggage, Ranger Gagnon found prescription bottles of medication, which the passenger in the truck claimed. Nothing else was found. Ranger Gagnon proceeded to count the pills in the prescription bottles and questioned the passenger about the medications to see whether there was anything awry. This prompted Ranger Gagnon to request consent to search the passenger, which was granted, again yielding nothing.

At this point, Ranger Gagnon testified that he returned to Moore and requested his vehicle registration and insurance information. Ranger Gagnon testified that he then requested consent to search Moore's person. Ranger Gagnon testified that Moore never gave oral consent to search but rather simply "turned around and raised his arms slightly." Ranger Gagnon asked Moore if he had any needles or sharp objects on his person that could hurt the Ranger, and Moore

2

said "no." The search of Moore's person turned up a pipe and a small amount of marijuana in Moore's pocket. Throughout this encounter, which Ranger Gagnon testified lasted roughly twenty-seven minutes, the Ranger retained possession of Moore's license, and later his registration and insurance information as well. Based on the search of Moore's person, Ranger Gagnon issued Moore a citation for possession of marijuana. No citation was issued concerning the vehicle's headlights.

On October 2, 2007, twelve days after the close of evidence in this matter, the United States submitted a letter to the court. The letter offers a different account of the stop in this case from the one presented by the Ranger under oath in open court. In particular, the letter states that the Ranger viewed the videotape of the stop after trial and wanted to apprise the court that the search of defendant Moore's person took place before the search of the pickup truck, and not afterwards, as he testified at trial. The United States then moved to reopen the evidence to allow the Ranger to correct his testimony based on his review of the videotape. The court granted a hearing on the motion to reopen, and, upon mutual agreement of the parties, the court admitted the videotape of the stop into evidence. Moore waived both his right to testify as well as his right to cross-examine Ranger Gagnon a second time based on this additional evidence.

The video of the stop differed significantly from Ranger Gagnon's recollection at trial. The video reveals that Ranger Gagnon informed Moore as to the reason for the stop, and Moore replied that he believed he had his lights on, that the vehicle belonged to his stepfather, and that he and his passenger "were up here for Floyd" and were trying to find a store to get coffee. Immediately after this, Ranger Gagnon asked Moore for his license, ordered him to exit the vehicle and stand towards the rear of the truck, and began questioning him about weapons,

alcohol and drugs. No further mention was made of the reason for the stop, not having low-beam headlights on in the fog, as the stop morphed into an interrogation about contraband. Twenty-five seconds elapsed from the time that Ranger Gagnon approached the vehicle to the time that Ranger Gagnon ordered Moore to step out of the vehicle. A total of thirty-eight seconds elapsed before Ranger Gagnon began interrogating Moore about guns, drugs, and alcohol.

The video reveals that Ranger Gagnon's memory of the sequence of events was flawed. Moore gave Ranger Gagnon consent to search the vehicle after answering questions about guns, alcohol and drugs, and began walking back towards the truck, at which point Ranger Gagnon ordered Moore to return to standing near the Ranger's vehicle and asked him again about drugs, alcohol, and weapons. The Ranger also questioned Moore about his relationship with the passenger in the truck. Ranger Gagnon informed Moore that because he had given consent to search the vehicle, he was going to do just that. Prior to searching the vehicle, however, Ranger Gagnon ordered Moore to move to the other side of the Ranger's vehicle.

Ranger Gagnon then approached the vehicle for a second time and asked the passenger numerous questions about drugs, alcohol, and weapons in the vehicle, his relationship with Moore and the luggage in the bed of the truck. Ranger Gagnon asked the passenger for his identification and then requested consent to search his person. The Ranger told the passenger that he was looking for firearms, open alcohol and drugs. Ranger Gagnon placed the passenger's identification in his breast pocket and ordered the passenger out of the vehicle to stand by the Ranger's vehicle and away from Moore. Ranger Gagnon searched the passenger off camera and apparently found nothing on his person. After finding nothing on the passenger and lacking any objective basis for suspicion, Ranger Gagnon then walked over to where he had instructed Moore

4

to stand and requested consent to search his person. Moore made no audible response to this request. As the frisk of Moore was off camera, there is no visual confirmation of the consent testified to by Ranger Gagnon. Ranger Gagnon's testimony that he asked Moore about needles or sharp objects, however, is audible, and Moore states that he does not have any such items on his person. The video reveals that at this point, and not after the search of the vehicle, Ranger Gagnon found the marijuana pipe on Moore's person.

## II.

The Fourth Amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." A warrantless search or seizure violates the Fourth Amendment when the defendant has a reasonable expectation of privacy that is invaded by government action. California v. Ciraolo, 476 U.S. 207, 211 (1986). A reasonable expectation of privacy exists when a defendant manifests a subjective expectation of privacy that society is willing to recognize as reasonable. Smith v. Maryland, 442 U.S. 735, 740 (1979).

Fourth Amendment jurisprudence has created exceptions to the warrant requirement, one of which is the automobile exception. California v. Carney, 471 U.S. 386, 390 (1985). Fourth Amendment privacy interests protect automobiles, but such protections are diminished because automobiles are readily moveable and subject to heavy regulation. Id. at 390-93. Here, even though the truck was owned by his stepfather, Moore had a reasonable expectation of privacy in the truck and its contents. United States v. Rusher, 966 F.2d 868, 874 (4th Cir. 1992) (finding that driver of a truck did have a reasonable expectation of privacy in the truck despite not owning the truck). Without question, Moore had a reasonable expectation of privacy in his person.

5

The court must next decide whether a seizure occurred, and if so, whether such seizure was reasonable. For purposes of the Fourth Amendment, a seizure occurs when an automobile is stopped and its occupants are detained. Delaware v. Prouse, 440 U.S. 648, 653 (1979). Therefore, a seizure occurred as soon as Ranger Gagnon pulled Moore over for driving in fog with only his parking lights on.

Because of their brevity and limitation in scope, however, ordinary traffic stops are limited seizures that are more akin to an investigative detention. Berkemer v. McCarty, 468 U.S. 420, 439 (1984); Rusher, 966 F.2d at 874. As such, police conduct in an ordinary traffic stop must be analyzed using the Supreme Court's analysis in Terry v. Ohio, 392 U.S. 1 (1968). Under Terry, the court must determine "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstance which justified the interference in the first place." Id. at 20.

The propriety of an officer's traffic stop is analyzed objectively by the facts and circumstances confronting the officer at the time of the stop and not by the officer's actual subjective state of mind. Maryland v. Macon, 472 U.S. 463. 470-71 (1985). The Fourth Circuit has adopted a purely objective standard in determining the legality of a traffic stop. United States v. Hassan El, 5 F.3d 726, 730 (4th Cir. 1993) ("We adopt the objective test and . . . hold that when an officer observes a traffic offense or other unlawful conduct, he or she is justified in stopping the vehicle under the Fourth Amendment.").

At trial, Moore argued that the traffic stop was improper because under Virginia law the headlights violation, Va. Code § 46.2-1030, is a secondary violation, requiring a primary violation before a citation can be issued. Moore's argument is misplaced for two reasons. First,

6

the Code of Federal Regulations does not make such a distinction between primary and secondary violations, and driving in thick fog without headlights on can constitute a violation of 36 C.F.R. § 4.22(b)(1) concerning unsafe operation. Second, even if Virginia law controlled, Va. Code § 46.2-1030(F) does not invalidate the stop itself, rather it only functions to preclude issuance of a citation under Virginia law for the headlight violation unless there was cause to stop or arrest the driver for some other violation, a point which Moore now concedes on brief.[2] Thus, the initial traffic stop was constitutionally proper.

Next, the court must determine whether Ranger Gagnon's subsequent investigation exceeded the scope of the initial traffic stop. The Fourth Circuit has held that the proper investigative scope of a traffic stop is limited as follows:

> [T]he officer may request a driver's license and vehicle registration, run a computer check, and issue a citation. When the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning. Any further detention for questioning is beyond the scope of the Terry stop and therefore illegal unless the officer has reasonable suspicion of a serious crime.

Rusher, 966 F.2d at 876 (internal quotation and citation omitted).

The government argues that Moore plainly consented to the search of his person and that the search was the product of a consensual encounter between Moore and Ranger Gagnon. The Terry analysis is inapplicable if the traffic stop becomes a consensual encounter between the

---

[2] Va. Code § 46.2-1030(F) provides:
> No citation for a violation of clause (iii) of subsection A of this section shall be issued unless the officer issuing such citation has cause to stop or arrest the driver of such motor vehicle for the violation of some other provision of this Code or local ordinance relating to the operation, ownership or maintenance of a motor vehicle or any criminal statute.

7

officer and driver. United States v. Meikle, 407 F.3d 670 (2005). A consensual encounter does not rise to the level of a seizure nor does it implicate the Fourth Amendment, rather the proper inquiry is "whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." Florida v. Bostick, 501 U.S. 429, 439 (1991); Rusher, 966 F.3d at 877; United States v. Weaver, 282 F.3d 302, 309 (4th Cir. 2002) ("Circumstances where the citizen would feel free to go, but stays and has a dialogue with the officer, are considered consensual, and therefore do not implicate the Fourth Amendment."). "If a reasonable person would have felt free to decline the officer's request or otherwise terminate the encounter, and the suspect freely gives consent to search at this point" there is no need to determine whether the officer exceeded the scope of the traffic stop. Meikle, 407 F.3d at 672. If the traffic stop in this case had become a consensual encounter between Ranger Gagnon and Moore, then Moore's consent to search his person is valid even in the absence of reasonable articulable suspicion.

To determine whether an encounter between an officer and a citizen has become a consensual encounter, courts look to the totality of the circumstances and rely on numerous factors including "the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the officer's statement to others present during the encounter, the threatening presence of several officers, the potential display of a weapon by an officer, and the physical touching by the police of the citizen" to determine consent. Weaver, 282 F.3d at 310. A highly material factor in the totality of the circumstances analysis is the retention of "a citizen's identification or other personal property or effects." Id. While highly material, retention of a driver's license is not in and of itself always determinative. Indeed, the

8

Fourth Circuit in Weaver expressly declined to adopt a bright-line rule "that when an officer retains an individual's identification beyond its intended purpose . . . the individual whose identification is retained is effectively seized." Id. Therefore, the fact that Ranger Gagnon retained Moore's license in this case is probative, but not in and of itself dispositive of the consensual nature of the encounter. Rather, the facts of the encounter must be analyzed as a whole.

For example, in Weaver, the officer retained Weaver's driver's license, yet the court did not find a constitutionally prohibited seizure. Id. at 311-12. The Fourth Circuit relied heavily on the fact that Weaver was a pedestrian at the time and could have terminated the encounter and walked away from the officer without his identification. Id. Weaver is, of course, distinguishable from this case because Moore was driving a vehicle on an isolated stretch of the Blue Ridge Parkway and thus could not readily walk away. Certainly, he could not lawfully drive away without his license. Further, unlike in Weaver, the encounter between Ranger Gagnon and Moore began as a traffic stop.

The Fourth Circuit has found encounters to be consensual in the context of traffic stops on a number of occasions. See United States v. Sullivan, 138 F.3d 126 (4th Cir. 1998); United States v. Lattimore, 87 F.3d 647 (4th Cir. 1996) (en banc); Rusher, 966 F.2d at 872. However, the unifying characteristic of Sullivan, Lattimore, and Rusher is that the officers in those cases returned the citizen's identification before requesting consent to search. Weaver, 282 F.3d 311. Thus, the defendants in those cases were free to leave before consent to search was sought.[3]

---

[3]The government relies on Lattimore and argues that there is a similarity of circumstances between that traffic stop and the traffic stop here including such things as the defendant's age,
(continued...)

9

Here, in contrast, Ranger Gagnon did not return Moore's driver's license, the stop was a routine traffic stop, and Moore was operating the motor vehicle at the time the encounter began. Weaver, 282 F.3d at 311 (finding that retention of one's driver's license in the context of a traffic stop amounts to an effective seizure of the individual, because the individual would have to "choose between the Scylla of consent to the encounter or the Charybdis of driving away and risk being cited for driving without a license. That is, of course, no choice at all, and that is why . . . the retention of one's license is a highly persuasive factor in determining whether a seizure occurred.").

The retention of Moore's license is not the only factor that destroys any notion of a consensual encounter between Ranger Gagnon and Moore. Ranger Gagnon ordered Moore to exit the vehicle after requesting his license. Ranger Gagnon ordered Moore to walk over to the Ranger's vehicle and interrogated him twice about firearms, alcohol or drugs, matters wholly irrelevant to whether Moore had his headlights on in fog, the original justification for the stop. The Ranger also questioned Moore about his relationship with the passenger, which also has nothing to do with the justification for the initial stop. Ranger Gagnon then ordered Moore to walk over to the other side of the vehicle. Ranger Gagnon proceeded to interrogate the passenger as to issues completely unrelated to the original stop, asked for his identification, for consent to search his person and belongings, and ordered him to exit the vehicle. Ranger Gagnon ordered

---

[3](...continued)
time and location of the stop and the presence of only one officer. The critical distinction between Lattimore and the case at bar, of course, is that Ranger Gagnon retained Moore's license in this case, effectively eliminating his ability to leave. See Weaver, 282 F.3d at 311.

the passenger to stand on the opposite side of the Ranger's vehicle from Moore and proceeded to pat him down.

At this point, Ranger Gagnon asked Moore for consent to search his person, and, without an audible response or any visual evidence, Ranger Gagnon proceeded to search Moore's person off camera. Given the totality of the circumstances surrounding the encounter, the court must find that this encounter was not consensual and amounts to a seizure that must be analyzed under Terry. Specifically, the fact that Ranger Gagnon held both the passenger's and Moore's license and that Ranger Gagnon ordered Moore and the passenger around several times, supports a finding that no reasonable person in Moore's position would have felt free to leave or terminate the encounter. As such, this was not a consensual encounter, and a seizure occurred in this case.

Furthermore, the testimony of Ranger Gagnon was the only evidence presented at trial as to Moore's non-verbal consent to the search. Because Ranger Gagnon's testimony is contradicted directly by the video evidence in several respects, the court cannot reasonably rely on his testimony as to the consent. The only credible evidence the court has before it is the video of the stop which did not capture Moore's alleged non-verbal consent. As such, the court cannot find that the government has produced evidence sufficient to establish actual consent, even if this was a consensual encounter, a finding the court also cannot make.

While the test to determine whether an encounter is consensual is an objective one from the perspective of the citizen, it is worth noting that Ranger Gagnon testified that Moore was not free to leave and he would not have permitted Moore to leave prior to searching his person. Ranger Gagnon testified that he had the intention to detain Moore regardless of any issue concerning the vehicle's headlights. When defense counsel asked if Moore was free to go,

11

Ranger Gagnon testified "no, not until I searched him." Ranger Gagnon testified that citizens are not free to leave until he is "complete with [his] stop, yeah, whether its through, hey you're free to go, or here's your license, here's your citation, here's your warning." The subjective intentions of the Ranger are not a factor in the totality of the circumstances, but, nonetheless, they are indicative of the nature, scope, and extent of the stop.

Finding the encounter between Ranger Gagnon and Moore not to be consensual, the court must next determine whether Ranger Gagnon exceeded the proper investigative scope of a traffic stop. Rusher, 966 F.3d at 876. Ranger Gagnon did not cite Moore for not having his headlights on, as the stop quickly escalated from one involving a minor traffic violation into an inquisition regarding contraband. Rather than address the reason for the stop, Ranger Gagnon proceeded to interrogate Moore and the passenger, search the passenger, search Moore, search the vehicle, rummage through the luggage located therein, and count pills in medicine bottles, all of which was far beyond the scope of the initial stop. Rusher, 966 F.3d at 876-77 ("Any further detention for questioning is beyond the scope of the Terry . . . .").

When an investigative stop goes beyond the scope of the initial justification, it is illegal unless the officer has a reasonable, articulable suspicion of a serious crime. Id.; see also Florida v. Royer, 460 U.S. 491, 498-499 ("[C]ertain seizures are justifiable under the Fourth Amendment if there is articulable suspicion that a person has committed or is about to commit a crime."). Under the circumstances of this case, unless Ranger Gagnon had a reasonable articulable suspicion to detain Moore for questioning about contraband, the search conducted was illegal. Royer, 460 U.S. at 498-99. The reasonable articulable suspicion standard is "a less demanding standard than probable cause and requires a showing considerably less than preponderance of the

12

evidence." Illinois v. Wardlow, 528 U.S. 119, 123 (2000); United States v. Grady, 214 Fed. Appx. 324, 326 (4th Cir. 2007). Nevertheless, "[a]n officer conducting an investigative stop . . . must articulate a particularized and objective basis for suspecting the particular person stopped of criminal activity." Wardlow, 528 U.S. at 127 (quoting U.S. v. Cortez, 449 U.S. 411 (1981)) (internal quotations omitted).

The approach requires common sense on the part of the courts and they may rely on the experience of officers who are exposed to criminal activity on a daily basis. Grady, 214 Fed. Appx. at 326. At the same time, in applying Terry, the court must remain cognizant that a Terry frisk "is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and is not to be undertaken lightly." 392 U.S. at 17. Furthermore, "[i]t is the State's burden to articulate facts sufficient to support reasonable suspicion." Id. At 140.

The court cannot find, even under the relatively low Terry standard, that the government has met its burden and that the search in this case was legal. No reasonable articulable suspicion existed to justify the prolonged detention and questioning of Moore. Ranger Gagnon testified that as he approached the vehicle, Moore placed both his hands outside of the vehicle, demonstrating his willingness to cooperate. Moore's continued cooperation, talkative demeanor and friendly attitude does not suggest that crime was afoot. Finally, Ranger Gagnon testified that Moore was breathing heavily, sweating, and taking his hat on and off during the stop, but the video does not bear this out. Review of the video shows that Moore did not take his hat on and off in a nervous manner as the Ranger testified. Instead, Moore took his hat off once when Ranger Gagnon ordered him out of the truck. Rather than appearing nervous, shifty, or suspicious in any degree, Moore appeared cooperative and friendly on the video. Furthermore, in

13

the video, Ranger Gagnon explicitly states to Moore that he wasn't "sweating when [he] got out of the vehicle" and only began sweating after the Ranger patted him down and found the marijuana pipe.

The video shows that Ranger Gagnon requested Moore's license and ordered him to exit the vehicle immediately after Moore told Ranger Gagnon that he was at Floydfest. At this point in the stop, a mere twenty-five seconds into it, the only activities that Ranger Gagnon witnessed to provide any basis for a reasonable articulable suspicion were Moore's placing of his hands out of the truck's window as Ranger Gagnon approached vehicle and Moore's statements that he thought he had his lights on, was looking for a place to get coffee, and that he just left Floydfest. Ranger Gagnon does not ask any questions about why Moore had his hands out of the vehicle or otherwise mention it, thus leaving Moore's statement as to where he had been as the only possible source of suspicion. In contrast to the Ranger's testimony, on the video Moore does not seem nervous, his responses seem perfectly normal, and there is no indication that he is breathing heavily. One aspect of the stop that Ranger Gagnon did testify about correctly was Moore's cooperative, friendly, and polite behavior.

Thus, the only basis for any suspicion that the court can glean from the video is Moore's statement that he had been at Floydfest. As explained above, Floydfest is an annual music festival held in Floyd County, Virginia. To access the festival, many people travel on the Parkway. Due to the increased volume of traffic on the Parkway, the NPS has established a Criminal Interdiction Team, the focus of which is festival attendees. Ranger Gagnon testified that the focus of the Criminal Interdiction Team was drugs, alcohol, and weapons, mirroring the line of questioning posed to Moore and his passenger.

14

By itself, the fact that Moore attended the festival is not enough to justify the prolonged stop, detention, and interrogation by Ranger Gagnon. See Texas v. Brown, 443 U.S. 47, 52 (1979) (holding that a person's presence in a high crime area is an insufficient basis for a reasonable articulable suspicion to detain an individual under the Fourth Amendment); see also U.S. v. Mayo, 361 F.3d 802, 807 (4th Cir. 2004) (finding that an encounter occurring in a high-crime area that was targeted for special enforcement by police is not reasonable suspicion unless coupled with other suspicious activity). Despite the fact that Floydfest was targeted by the NPS for increased officer activity, no evidence was introduced that it is a high crime area, and individuals must remain secure in their right to be free from unreasonable and unwarranted interference by overzealous policing. Brown, 433 U.S. at 52 ("The record suggests an understandable desire to assert a police presence; however, that purpose does not negate Fourth Amendment guarantees. In the absence of any basis for suspecting appellant of misconduct, the balance between the public interest and appellant's right to personal security and privacy tilts in favor of freedom from police interference."). To be sure, the public traveling on the Parkway needs to be protected from drunk drivers and other illegal activity, including illegal drug use and trafficking. That being said, police activity on the Parkway must still be subject to and limited by the guarantees of the Fourth Amendment. Id. Basing Moore's detention purely on the fact that he attended Floydfest, without any other fathomable objective basis, creates an intolerable risk of arbitrary and abusive police practices. Id. ("When such a stop is not based on objective criteria, the risk of arbitrary and abusive police practices exceeds tolerable limits.") From an objective standpoint, the circumstances of this traffic stop, considering the purpose of the stop, Moore's friendly, cooperative and talkative demeanor, and his attendance at Floydfest, does not provide

15

any reasonable, articulable suspicion of criminal activity. As the Court noted in Wardlow, 528 U.S. at 125, "the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior," which are wholly lacking here.

Given the original purpose of the stop, the coercive nature of the encounter, the retention of Moore's license, and the fact that Moore was not free to leave, the court cannot find the stop to be a consensual encounter. Furthermore, Moore's willing cooperation with the officer and the fact that he attended Floydfest do not rise to the level of a reasonable, articulable suspicion justifying the search of Moore's person. Accordingly, defendant's Motion to Suppress the evidence seized from the search of his person is **GRANTED** and this case will be **DISMISSED** by separate order.

The Clerk of the Court is hereby directed to send a copy of this Memorandum Opinion to counsel of record.

**ENTER:** This 26th day of October, 2007.

Michael F. Urbanski
United States Magistrate Judge